Jane BANNAR, Betty S. Carter, Joseph S. Carter, Reuben H. Close, Daniel S. Collmann, John Corry, Charles D. Edwards, David H. Fulford, Robert S. Fulford, William T.M. Johnson, Eliza B. Lewis, Lloyd W. Lewis, Harold F. Read, Jr.,

Helen Read,: H. Fred Read, Iii, Katharine B.: Sax, W. Peter Sax, Geraldine Seymour, Steven D. Seymour, Joseph D. Walsh, Marilyn P. Walsh, Patrick L. Walsh, Elaine Weimer, George Weimer, and Robert J. Williams

v.

Harry D. MILLER, Jr., Jean Miller, Harry D. Miller, Iii, Paul A. Logan and Powell, Trachtman, Logan & Liddle, a Professional Corporation, and Brownstone Inn, Inc.

**Appeal of Paul A. LOGAN and Powell, Trachtman, Logan & Liddle, a Professional Corp.**

Superior Court of Pennsylvania.

Argued Dec. 19, 1996.

Filed Aug. 27, 1997.

Reargument Denied Nov. 7, 1997.

Andrew L. Braunfeld, Norristown, for appellants.

Garland D. Cherry, Sr., Media, for Jane Bannar, etc., appellees.

Before EAKIN, SCHILLER and MONTEMURO*, JJ.

EAKIN, Judge.

In 1956, appellant Harry Miller Jr. began operating a septic pumping business from a farm he and his wife Jean Miller owned in Thornbury Township. In 1975, Miller sold the business to his son, Harry Miller III who also operated a portable toilet business and Christmas tree farm from the site. The Pennsylvania Department of Environmental

* Retired Justice assigned to Superior Court.

Resources ("DER")[1] issued him a permit which allowed him to fertilize the trees with the sewage from the septic business.

Harry Miller Jr. and Jean Miller owned a restaurant, the Brownstone Inn, approximately 1/2 mile from the farm, which they operated from 1974 until 1992. Harry Miller Jr. and Harry Miller III stored portable toilets and empty propane tanks on a portion of the Inn's lot.

Neighboring residents expressed concern over the environmental and personal impact of these businesses on the health, safety and welfare of their community as a whole. The residents complained to the township, DER, and the Environmental Protection Agency about foul odors, pollution, and possible violations of the DER permit. DER issued citations to Harry Miller III for violations of the terms of the permit.

On May 15, 1988, one group of residents decided to air their frustration by picketing the Inn. On May 20, 1988, the Millers were granted an injunction limiting the picketing to areas 300 feet from the Inn. In December 1988, the residents also began picketing Harry Miller III's tree farm. An injunction limiting these picketers was granted December 16, 1988.

Picketing continued at the Inn every Sunday for over a year and one-half; the picketers carried signs claiming the Millers were dumping sewage at the site and urging the public not to patronize the Inn. These residents became known as the Grist Mill Area Conservancy ("GMAC").

On December 23, 1988, appellants Paul A. Logan and his firm, Powell, Trachtman, Logan & Liddle filed a civil suit on behalf of their clients the Millers and the Brownstone Inn, naming as defendants twenty-eight presumed members of the GMAC, as individuals and as members of that association, and GMAC itself. The document appellants drafted alleged the defendants were liable to the Millers and the Inn for defamation, injurious falsehood, invasion of privacy, interference with contractual relations, nuisance, outrageous conduct, and conspiracy. The complaint demanded compensatory damages for loss of income at the Inn and diminution in property value in the amount of one million dollars for each count as well as punitive damages in the amount of one million dollars *from each individual* named in the suit *for each count.*

In February 1988, defendants filed preliminary objections to strike the damages portion of the complaint as violative of the Pennsylvania Rules of Civil Procedure. In May 1988, default judgment was entered in favor of the Millers and against GMAC for failure to answer the complaint, but the action was later reopened because the preliminary objections remained outstanding. In February 1990, the residents served appellants' clients with interrogatories requesting the factual basis of the allegations in the complaints. There was no response to the interrogatories and on June 15, 1990, the preliminary objections were granted. On July 10, 1990, the Millers agreed to discontinue the suit as to all individual residents, leaving only GMAC in the litigation.

In November 1990, the individuals named as defendants in the Millers' suit sued Harry Miller III, Harry Miller Jr., Jean Miller, the Brownstone Inn, Inc., and the instant appellants who represented them. This action was pursuant to the Dragonetti Act, 42 Pa. C.S. § 8351, and alleged the Millers' suit was filed without probable cause and for a wrongful purpose.

On October 6, 1992, on the eve of trial on the original complaint, the Millers withdrew the remains of their action against GMAC.

A jury trial commenced on the Dragonetti action on June 28, 1993. The jury returned a verdict awarding David Fulford $10,000, and the other twenty-four appellees $5,000 each. Each appellee was also awarded punitive damages against the Millers; the judge declined to allow punitive damages against appellants herein.

Everyone filed post-trial motions for relief; appellees argued the trial court improperly

1. In 1996, the Department of Environmental Resources became known as the Department of Environmental Protection ("DEP").

failed to submit to the jury the issue of punitive damages against Attorney Logan and his firm. By order entered February 22, 1995, the trial court denied all motions for post-trial relief.

Timely appeals were filed with this Court in three different groups; Paul Logan and Powell, Trachtman, Logan & Liddle appeal herein; Harry Miller III appeals alone; Harry Miller Jr., Jean Miller, and the Brownstone Inn, Inc. appeal together. Although each appeal was filed separately, they arise from common facts and share the same original record.

Appellants, Paul S. Logan, Esq. and Powell, Trachtman, Logan & Liddle, P.C., raise seven issues on appeal:

(1) Was the verdict against the evidence and the law?

(2) Did the Trial Court err in submitting the issue of whether attorneys had wrongfully used civil proceedings to the jury and in denying a motion for judgment notwithstanding the verdict where the required elements of the tort had not been established, the absence of probable cause of the attorneys was not established, probable cause existed as a matter of law and was for the Court to decide, and the element of favorable termination was not applicable to the attorneys where they had been instructed by clients to discontinue the action[?]

(3) Did the Trial Court err in instructing the jury on gross negligence as a basis on which to establish the tort of wrongful use of civil proceedings against an attorney where probable cause on the part of the attorney existed and where there was no expert testimony on the issue of gross negligence or other issues involving the Rules of Civil Procedure[?]

(4) Did the Trial Court's jury instructions on wrongful use of civil proceedings by attorneys constitute an erroneous statement of law, thereby warranting the grant of a new trial?

(5) Did the Trial Court err in charging the jury on conspiracy when the claim for conspiracy had been withdrawn and where there was no evidence to support the claim of conspiracy[?]

(6) Did the Trial Court err in instructing the jury on recovery of damages for emotional distress where there was no medical testimony and in admitting evidence of environmental issues and issues of compliance with ordinances during a time period significantly prior to the commencement of the litigation which gave rise to the action for wrongful use of civil proceedings[?]

(7) Did the Trial Court err in not granting a motion for post-trial relief when the verdicts returned established that the jurors did not understand or follow the law concerning the wrongful use of civil proceedings and concerning damages[?]

■■■ Appellants' first two issues argue the evidence adduced at trial established probable cause, and was thus insufficient to support the jury's verdict; as such they are entitled to judgment notwithstanding the verdict (judgment n.o.v.). Our standard of review of an order denying judgment n.o.v. is whether, reading the record in the light most favorable to the verdict winner and granting the benefit of every favorable inference, there is sufficient competent evidence to support the verdict. *Wenrick v. Schloemann–Siemag Aktiengesellschaft, et al.,* 523 Pa. 1, 564 A.2d 1244 (1989). Any conflict in the evidence must be resolved in the verdict winners' favor. *Jones v. Constantino,* 429 Pa.Super. 73, 631 A.2d 1289 (1993), *alloc. denied,* 538 Pa. 671, 649 A.2d 673 (1994). Judgment n.o.v. may be granted only in clear cases where the facts are such that no two reasonable minds could fail to agree that the verdict was improper. *Pirozzi v. Penske Olds–Cadillac–GMC, Inc.,* 413 Pa.Super. 308, 605 A.2d 373 (1992). Upon a thorough review of the record, we find the evidence supports the verdict against appellants.

There was evidence that appellants had represented the Millers in various legal matters since 1981. Appellants were aware of Harry Miller Jr.'s conviction for violating a zoning ordinance, and knew of the numerous citations issued by Thornbury Township and DER. The complaint appellants drafted was directly contrary to this knowledge.

There was evidence appellants filed suit on behalf of a named plaintiff, Darlene Miller,

without consulting her. Darlene Miller, whose deposition testimony was read at trial, stated she had never been consulted about filing the lawsuit, about the discontinuation of the suit, or about any damages she may have sustained. Nevertheless, appellants included her, sought damages in her name, and neglected her input when the suit was withdrawn.

There was also testimony about the choice of defendants named in the suit. Particularly, appellants were informed one of the named defendants had not participated in the picketing or other activities; appellants failed to investigate this matter and continued the multi-million dollar suit against this particular defendant. Conversely, appellants did not name some of the other persons who *did* picket the Millers' properties. The jury could easily conclude appellants treated the picketing citizens as fungible, a reckless attitude at best for an officer of the court.

Appellants drafted a complaint that pleaded damages in excess of $1 million compensatory and $1 million punitive damages for each named defendant on each count. Not only is this clearly in violation of the Pennsylvania Rules of Civil Procedure, but it bespeaks a settled purpose of frightening the dickens out of citizens exercising their constitutional rights.

The jury was free to draw a reasonable inference from this evidence that appellants had an improper purpose, such as chilling appellees' constitutional rights. There can be no contention this evidence was insufficient, especially when viewed in the light most favorable to the verdict winner.

Appellants argue the verdict was infirm as a matter of law. The tort of wrongful use of civil proceedings is codified at 42 Pa.C.S. § 8351(a), the Dragonetti Act. The elements of the cause of action are stated as follows:

§ 8351. Wrongful use of civil proceedings

(a) Elements of action.—A person who takes part in the procurement, initiation or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings [if]:

(1) He acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings are based, and

(2) the proceedings are terminated in favor of the person against whom they are brought.

This Court has recently reviewed § 8351 and outlined the elements as follows:

To succeed in a cause of action for wrongful use of civil proceedings, a plaintiff must allege and prove the following three elements: 1) that the underlying proceedings were terminated in their favor; 2) that defendants caused those proceedings to be instituted without probable cause; and 3) that the proceedings were instituted for an improper purpose.

*Hart v. O'Malley,* 436 Pa.Super. 151, 160–61, 647 A.2d 542, 547 (1994), *aff'd,* 544 Pa. 315, 676 A.2d 222 (1996) (citing *Kelly–Springfield Tire Co. v. D'Ambro,* 408 Pa.Super. 301, 596 A.2d 867 (1991)); *Shaffer v. Stewart,* 326 Pa.Super. 135, 140, 473 A.2d 1017, 1020 (1984).

■ The first question is whether the original action was terminated in favor of appellees. "Whether withdrawal or abandonment constitutes a final termination of the case in favor of the person against whom the proceedings are brought ... depends on the circumstances under which the proceedings are withdrawn." *Rosenfield v. Pennsylvania Auto. Ins. Plan,* 431 Pa.Super. 383, 389, 636 A.2d 1138 (1994) (quoting *Restatement (Second) of Torts* § 674 cmt. j (1977)). The Millers served a Complaint on appellees, who filed Preliminary Objections. Appellees also served interrogatories upon the Millers. Instead of having their clients respond to the interrogatories, appellants caused a default judgment to be entered in May 1988 for GMAC's failure to answer the Complaint; the default judgment was opened because Preliminary Objections were outstanding.

The court allowed an Amended Complaint to be filed if the *ad damnum* clauses were corrected; appellants never had their clients file an Amended Complaint. The individual defendants were voluntarily dismissed, but the action against GMAC was scheduled for

trial in October 1992. Only on the very day of trial, when the matter was called, did the Millers in open court request permission to withdraw the action against GMAC.

These factual circumstances lead to a determination that the voluntary dismissal constitutes a final determination in favor of the persons against whom the proceedings were brought; they tend to establish neither clients nor attorneys were attempting to properly adjudicate the claim. A last-second dismissal in the face of imminent defeat is not favorable to appellants. Appellants did not answer the bell in the fight they started, which is a victory for the other side.

█ Such a result is conclusively binding upon the attorneys as well as the clients. Appellants' contention to the contrary would permit attorneys to participate in the use of legal proceedings for improper purposes, and escape liability if the client voluntarily dismisses the action at the eleventh hour. Such a rule would permit the lawyer to be immune to sanctions for impermissible use of process by hiding behind the layman who paid for the lawyer's advice. This creates an inherent conflict of interest in the attorney-client relationship; indeed, the lawyer is to be the shield, not the shielded.

The next question concerns the existence of probable cause for the multi-million dollar suit. A person has probable cause if he or she "reasonably believes in the existence of the facts upon which the claim is based" and either

(1) Reasonably believes that under those facts the claim may be valid under the existing or developing law;
(2) Believes to this effect in reliance upon the advice of counsel, sought in good faith and given after full disclosure of all relevant facts within his knowledge information; or
(3) Believes as an attorney of record, in good faith that his procurement, initiation or continuation of a civil cause is not intended to merely harass or maliciously injure the opposite party.

42 Pa.C.S. § 8352.

█ Although probable cause is properly determined by the court when there are no material conflicts in the evidence, the existence of probable cause in this particular case was a mixed question of fact and law and was therefore properly submitted to the jury. *Wainauskis v. Howard Johnson Co.,* 339 Pa.Super. 266, 488 A.2d 1117, 1122 (1985).

Appellants argue that even if they lacked probable cause to procure, initiate or continue the civil proceedings, the authority of *Meiksin v. Howard Hanna Co., Inc.,* 404 Pa.Super. 417, 590 A.2d 1303, *alloc. denied,* 528 Pa. 644, 600 A.2d 196 (1991) would in effect hold them harmless. In *Meiksin,* this Court stated it has followed the Restatement (Second) of Torts § 674 cmt. d (1977) with respect to liability of attorneys in actions for the wrongful use of civil process. Comment d provides:

An attorney who initiates a civil proceeding on behalf of his client or one who takes any steps in the proceeding is not liable if he has probable cause for his action (see § 675); and **even if he has no probable cause** and is convinced that his client's claim is unfounded, he is still not liable if he acts primarily for the purpose of aiding his client in obtaining a proper adjudication of his claim. (See § 676). An attorney is not required or expected to prejudge his client's claim, and although he is fully aware that its chances of success are comparatively slight, it is his responsibility to present it to the court for adjudication if his client so insists after he has explained to the client the nature of the chances. If, however, the attorney acts **without probable cause** for belief in the possibility that the claim will succeed, and **for an improper purpose,** as, for example, to put pressure upon the person proceeded against in order to compel payment of another claim of his own or solely to harass the person proceeded against by bringing a claim known to be invalid, he is subject to the same liability as any other person.

*Id.* at 423–24, 590 A.2d at 1305. (Emphasis added). Based on this reasoning, the attorney may bring claims without probable cause in order to obtain the proper adjudication of the client's claims upon his client's insistence after disclosing to the client the likelihood of

the claim's success. This would in effect hold the attorney harmless for such claims unless the attorney acted primarily for an improper purpose or to harass the person proceeded against.

Appellants fail to acknowledge there was a factual issue as to whether this suit was brought for an improper purpose, namely to prevent appellees from exercising their rights under the First Amendment to the United States Constitution. Precisely because there was a dispute as to the existence of probable cause and improper purpose, appellants cannot rely on section 674 of the Restatement, as the premise for its application relies upon a question of fact; that is, the issue of improper purpose is one for the jury to decide. The trial presented issues of probable cause, gross negligence, and improper purpose; the court properly submitted these contested factual issues to the jury, which apportioned credibility to each side's witnesses and determined appellants wrongfully used civil proceedings. Upon examining the evidence in the light most favorable to the verdict winner, we cannot conclude two reasonable minds would agree the jury's determination was improper.

Further, the clear language of section 8351 permits a cause of action to be based on gross negligence or lack of probable cause. 42 Pa.C.S. § 8351. Therefore, even if the court determined probable cause did exist, appellants could still have been liable if they were found to have acted in a grossly negligent manner. *Id.* We find the evidence detailed above sufficient for a finding of gross negligence.

█ Appellants next argue it was error to submit the issue of professional negligence to the jury in the absence of expert testimony. Our Supreme Court has established that in actions for legal malpractice expert testimony is not required where the issues are not "beyond the knowledge of the average person." *Rizzo v. Haines*, 520 Pa. 484, 501–02, 555 A.2d 58, 66 (1989). Appellants make no contention the issues were complex or beyond the knowledge of the average person. "Where the issue is simple, and the lack of skill obvious, the ordinary experience and comprehension of lay persons can establish the standard of care." *Id.* at 501, 555 A.2d at 66. Therefore, there was no need for expert testimony on the issue of professional negligence in this particular case.

█ Appellants argue the trial court erred in instructing the jury on the Pennsylvania Rules of Civil Procedure. However, such instruction is clearly relevant to the determination of gross negligence, the existence or nonexistence of probable cause, and improper purpose. Appellants cite no authority for the proposition the jury should not have been instructed on such issues. We find no error here.

Appellants raise as their fourth and fifth questions whether the instructions regarding wrongful use of civil proceedings by attorneys constituted an erroneous statement of law, and whether the trial court erred in instructing on civil conspiracy.

█ When examining jury instructions, our scope of review is to determine whether the trial court committed a clear abuse of discretion or an error of law controlling the outcome of the case. *Williams v. Philadelphia Transp. Co.*, 415 Pa. 370, 374, 203 A.2d 665, 668 (1964). "Error in a charge is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue." *Stewart v. Motts*, 539 Pa. 596, 606, 654 A.2d 535, 540 (1995) (quoting *Glider v. Com. Dept. of Hwys.*, 435 Pa. 140, 151–52, 255 A.2d 542, 547 (1969)). A charge will be found adequate unless "the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error." *Id.* (quoting *Voitasefski v. Pittsburgh Rys. Co.*, 363 Pa. 220, 226, 69 A.2d 370, 373 (1949)). When reviewing a charge to the jury, we will not take the challenged words or passage out of context of the whole of the charge, but must look to the charge in its entirety. *McCay v. Philadelphia Elec. Co.*, 447 Pa. 490, 499, 291 A.2d 759, 763 (1972).

█ The trial court told the jury that appellees would satisfy their burden of proof

if the jury found that when bringing the underlying cause of action, appellants acted in "a grossly negligent manner *or* without probable cause." (N.T. 27). The trial court's instructions to the jury could not have been clearer; they were taken directly from the language of the Act. There is no merit to the position the jury was palpably misled or that these instructions were confusing.

■■■■ With regard to civil conspiracy, appellants argue an instruction on this cause of action should never have been read to the jury since appellees had allegedly withdrawn their conspiracy claim. The confusion is compounded by a sidebar conference which took place as the trial court had begun to read to the jury the instructions for civil conspiracy:

MR. BRAUNFIELD [Attorney for Mr. Miller, III]: Excuse me your honor. I know this is a bad thing to do, but I think we need to remind you of something at this point.

THE COURT: I don't know that Plaintiff has withdrawn it. Have you Mr. Cherry [Attorney for appellees]? Have you withdrawn your theory of civil conspiracy?

MR. CHERRY: Yes, we did Your Honor.

MR. BRAUNFIELD: It was withdrawn in Chambers.

THE COURT: Well, I think what was withdrawn was that it was a separate count on the verdict slip. And that specifically was what was under discussion when we were determining the issue of civil conspiracy. If Mr. Cherry withdraws it, that's fine.

MR. CHERRY: I have withdrawn it.

THE COURT: I thought not. All right.

MR. BRAUNFIELD: Sorry.

(N.T. 66–7).

In its opinion, the trial court offers the following conclusion about the meaning of the above exchange:

It was the Court's understanding, and the Plaintiffs', as well, that the request and consequent discussion concerned only the

verdict slip, and did not reflect upon the Court's instructions generally. The Plaintiffs did plead a cause in [sic] Civil Conspiracy against these Defendants, and therefore, the Court inquired whether Plaintiffs were pursuing that as an independent cause of action, which would necessitate an independent interrogatory on the verdict slip.

(Trial Court Opinion at 34).

A review of the record finds neither a specific nor general objection to the instructions on civil conspiracy.[2] Accordingly, we find that issue has been waived. Further, as conspiracy was not reflected on the verdict slip, the jury was incapable of returning a verdict on those counts; if error, and if not waived, the error is harmless.

■■■■ In their sixth issue, appellants claim the trial court erred in instructing the jury on damages for emotional distress, where there was no medical testimony supporting such damages. Appellants cite no cases that support this proposition under the Dragonetti Act. Section 8353 of the Act provides for damages:

When the essential elements of an action brought pursuant to this subchapter have been established as provided in section 8351 (relating to wrongful use of civil proceedings), the plaintiff is entitled to recover for the following:

(1) The harm normally resulting from any arrest or imprisonment, or any dispossession or interference with the advantageous use of his land, chattels or other things, suffered by him during the course of the proceedings.

(2) The harm to his reputation by any defamatory matter alleged as the basis of the proceedings.

(3) The expense, including any reasonable attorney fees, that he has reasonably incurred in defending himself against the proceedings.

(4) Any specific pecuniary loss that has resulted from the proceedings.

---

2. While appellants claim they preserved an objection to the court's civil conspiracy charge, and the trial court "understood" they were objecting, the record in fact shows only that they were

"very concerned" about the charge and expressed their disagreement with it. N.T., 7/26/93, at 96–99. This is neither a specific nor general "objection" to the court's instruction.

(5) Any emotional distress that is caused by the proceedings.

(6) Punitive damages in accordance with the law in appropriate cases.

42 Pa.C.S. § 8353.

In *Shelton v. Evans,* 292 Pa.Super. 228, 437 A.2d 18 (1981), our court, on appeal from a malicious prosecution action, affirmed a jury award of $20,000 in compensatory damages, even though the plaintiff could only prove $500 in actual damages. The court stated, "It is therefore evident that in awarding $20,000 compensatory damages, the jury expressed its opinion of what represented fair compensation for the intangible injuries appellee had suffered." *Id.* at 233–34, 437 A.2d at 21. No medical testimony was required to establish compensatory damages for the plaintiff's intangible injuries. *Id.* We see no reason to make medical testimony a prerequisite in order to establish compensatory damages for emotional distress simply because the matter is brought under the Dragonetti Act. A jury can reach a fair and competent determination of compensatory damages in the absence of medical testimony, based on evidence adduced at trial, even where the injury to the plaintiff is intangible.

 Appellants also allege the trial court erred in admitting evidence of environmental issues and issues of compliance with ordinances. This Court, in *Sprague v. Walter,* 441 Pa.Super. 1, 36, 656 A.2d 890 (1995), *alloc. denied,* 543 Pa. 695, 670 A.2d 142 (1996) set out the standards for admissibility of evidence:

> As a basic proposition, to be admissible, evidence must be both competent and relevant. *Taliferro v. Johns–Manville Corp.,* 421 Pa.Super. 204, 215, 617 A.2d 796, 802–03 (1992). Competent evidence is that which is relevant and material to the issues to be determined at trial. *See Black's Law Dictionary* 284 (6th ed. 1990).
>
> * * *
>
> Even relevant evidence is not admissible if it is shown to come within a rule which makes it excludable. *Hatfield v. Continental Imports, Inc.,* 530 Pa. 551, 557, 610 A.2d 446, 449 (1992). Furthermore, the trial court may properly preclude any evidence whenever its probative value is substantially outweighed by the danger of unfair prejudice, or if the trial judge determines that the evidence may confuse the issues or mislead the jury. *Daset Mining Corporation v. Industrial Fuels Corp.,* 326 Pa.Super. 14, 22, 473 A.2d 584, 588 (1984).

*Id.* at 57–58, 656 A.2d at 918.

Applying the above-cited standards leads to the conclusion the trial court did not abuse its discretion in admitting evidence of the Millers' noncompliance with environmental regulations and zoning laws and the appellants knowledge of such noncompliance.

Appellants argue the noncompliance might be relevant to appellees' state of mind in the action where they were sued by the Millers, but that such evidence is irrelevant and prejudicial in the determination of wrongful use of civil proceedings. What appellants fail to acknowledge is that evidence of noncompliance with regulations and laws and appellants' knowledge of such noncompliance is relevant evidence of the state of mind of both the Millers and appellants. The state of mind of the Millers and appellants is relevant because it goes to the heart of the determinations as to probable cause, gross negligence, improper purpose, and attorney-appellants credibility and good faith. In particular, the Complaint drafted and filed by appellants averred the Millers have always been in full compliance with all laws, rules and regulations. Whether the Millers have always been in full compliance with all laws, rules and regulations, and whether appellants had knowledge or information to the contrary, tends to prove material facts at issue.

Any prejudice does not substantially outweigh the probative value of such evidence. Noncompliance with laws, ordinances and regulations on the part of the Millers and knowledge of this noncompliance by the appellants is so probative of the determination of probable cause and improper purpose it would be error not to admit such testimony.

Appellants also argue such evidence would tend to confuse the jury. We see no reason to credit such an assertion; in the complex

matrix of this case, this point seems more straightforward than most.

■ Appellants' final contention is the trial court erred in not granting their motion for post-trial relief, when the verdicts returned established the jurors did not understand or follow the law concerning the elements of wrongful use of civil proceedings and damages. Support for this contention is based on the fact the jury, shortly after deliberations began, returned to ask the court who would pay the damages awarded; appellants cite this as evidence the jury did not understand or did not follow the law. This contention ignores the equally likely possibility that appellees' case was so strong that deliberations were brief, or that the jury wanted to be sure of themselves. Without more, this contention is meritless.

For the foregoing reasons, we affirm the judgment entered by the trial court.

Judgment affirmed.